Regina L. Regina L. Nassen (SBN 014574)
Regina.Nassen@tucsonaz.gov
Michelle R. Saavedra (SBN 25728)
Michelle.Saavedra@tucsonaz.gov
Principal Assistant City Attorney for
Michael G. Rankin
CITY ATTORNEY
P.O. Box 27210
Tucson, AZ  85726-7210
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for City of Tucson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| City of Tucson,<br><br>Plaintiff,<br><br>vs.<br><br>Scott Turner in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; and the U.S. Department of Housing and Urban Development<br><br>Defendants. | No. CV-25-353-BGM<br><br>**FIRST AMENDED COMPLAINT**<br><br>(Assigned to: Hon. Bruce G. MacDonald) |

**INTRODUCTION**

1. In December 2024, the U.S. Department of Housing and Urban Development ("**HUD**") awarded the City of Tucson, Arizona ("**Tucson**"), a *Preservation and Reinvestment Initiative for Community Enhancement* ("**PRICE**") grant for approximately $11.5 million, and, in January 2025, a *Pathways to Removing Obstacles to Housing* ("**PRO**") grant for $7 million. Tucson executed and returned the PRICE and PRO grant agreements (the "**Grant Agreements**") to HUD in January 2025.

2. HUD's actions since that time have made it increasingly clear that HUD will not release the PRICE funding unless Tucson signs an amendment to the PRICE Grant Agreement containing new conditions on the award that are based on Executive Orders issued by President Trump.

1

3. HUD has also made it clear that it will review the City's Action Plans for the grants for "alignment" with all Trump Executive Orders. These conditions were not included in the Notices of Funding Opportunity for the two grants (the "**NOFOs**") or in the Grant Agreements, and are not consistent with Congress's enactments creating the PRICE and PRO grant programs.

4. Congress, under U.S. Const. art I, § 8, cl. 1 (the "**Spending Clause**"), has the exclusive authority to place conditions on federal grants unless it specifically authorizes the Executive Branch to create such conditions within given parameters. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233 (9th Cir. 2018). Congress did not, in the legislation creating the PRICE and PRO grant programs, impose conditions like those that HUD now seeks to impose, nor did it delegate any discretion to impose such new conditions to the President or HUD. HUD's attempt to alter the terms of the grants—and alter them in a manner inconsistent with Congressional enactments—is therefore an unconstitutional usurpation of Congress's legislative authority.

5. Under the Spending Clause, even grant conditions imposed by *Congress* must be unambiguous, so that grantees can "voluntarily and knowingly accept[] the terms of the" grant "cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). That obviously means that the conditions must be in place *before* the grant is accepted by the grantee. *Id.* at 25 ("Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post-acceptance or 'retroactive' conditions."). Conditions must also be "reasonably related to the federal interest in particular national projects or programs." *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *New York v. United States*, 505 U.S. 144, 172 (1992). The new conditions that HUD is seeking to impose violate each of these Spending Clause limitations. Therefore, even if Congress had imposed the conditions or authorized HUD to do so, they would violate the Spending Clause.

6. Tucson files this lawsuit seeking an order from this Court declaring the Amendment to be unlawful, void, and unenforceable; enjoining HUD from conditioning the

1  awarded PRICE funding on Tucson's execution of the Amendment; enjoining HUD from
2  conditioning approval of Tucson's PRICE and PRO Action Plans on any new conditions;
3  and ordering HUD to allow Tucson to submit its PRICE and PRO Action Plans and to
4  thereafter process those Action Plans and administer the grants in a timely manner consistent
5  with the terms of the Grant Agreements, the NOFOs, and the Congressional acts creating
6  the two grant programs.

**JURISDICTION AND VENUE**

7.  The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq*.

8.  Venue properly lies in the District of Arizona because Plaintiff City of Tucson resides in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e)(1).

**PARTIES**

9.  Plaintiff City of Tucson is a municipal corporation and home-rule city organized and existing under the Constitution and laws of the State of Arizona and its adopted Charter.

10. Defendant HUD is an executive department of the United States federal government. 42 U.S.C. § 3532(a).

11. Defendant Scott Turner is the Secretary of HUD, the highest ranking official in HUD, and responsible for the decisions of HUD. He is sued in his official capacity.

**FACTUAL ALLEGATIONS**

**HUD PRICE Program**

12. Congress appropriated $225,000,000 in the 2023 Consolidated Appropriations Act (Public Law 117-328, approved December 29, 2022) (the "**2023 Appropriations Act**") for the PRICE program, under the Community Development Block Grant ("**CDBG**") umbrella, to provide "competitive grants to preserve and revitalize manufactured housing and eligible manufactured housing communities (including pre-1976 mobile homes) under

3

title I of the Housing and Community Development Act of 1974, as amended (42 U.S.C. 5301 et seq.)." It added an additional $10,000,000 to the program in the 2024 Consolidated Appropriations Act (Public Law 118-42, approved March 9, 2024) (the "**2024 Appropriations Act**").

13. In the 2024 Appropriations Act, Congress also appropriated $100,000,000 for the PRO program, which—like the PRICE program—is under the CDBG umbrella and Title I of the Housing and Community Development Act ("**Title I of the Housing Act**"), which is codified at 42 U.S.C. § 5301 through 5321.

14. Congress appropriated funding for the new PRICE program to provide grants for "infrastructure, planning, resident and community services (including relocation assistance and eviction prevention), resiliency activities, and providing other assistance to residents or owners of manufactured homes," with priority given to programs "that primarily benefit low-or moderately low-income residents and preserve long-term housing affordability."

15. Congress appropriated funding for the PRO program to provide grants for "additional activities under title I of the Act for the identification and removal of barriers to affordable housing production and preservation."

16. On February 28, 2024, HUD issued a Notice of Funding Opportunity for its Fiscal Years 2023 and 2024 PRICE Competition, which it later modified to add additional funding and clarify certain conditions (as modified, the "**PRICE NOFO**"). Consistent with Congressional intent, the PRICE NOFO stated that the purpose of the PRICE program is "to preserve long-term housing affordability for residents of manufactured housing or a[] [manufactured housing community (MHC)], to redevelop MHCs, and to primarily benefit low- and moderate-income (LMI) residents."

17. On August 13, 2024, HUD issued a Notice of Funding Opportunity for its FY 2024 PRO competition (the "**PRO NOFO**"). Consistent with Congressional intent, the PRO NOFO states that the program is intended to "empower[] communities that are actively

4

taking steps to remove barriers to affordable housing and seeking to increase housing production and lower housing costs over the long term."

**Tucson's PRICE and PRO Applications and Awards**

18. On July 2, 2024, Tucson, as the lead applicant for the Tucson-Pima County Regional PRICE Initiative, a coalition of governmental, educational, and nonprofit organizations, applied for PRICE funding in the amount of $22,660,923 million.

19. On October 13, 2024, Tucson, on behalf of itself and its partner, Pima County, applied for PRO funding in the amount of $7,000,000.

20. On December 19, 2024, HUD announced that Tucson's PRICE application, one of only 17 selected for funding out of over 175 submitted, had been chosen for PRICE funding in the amount of $11,519,567.21.

21. On January 9, 2025, HUD announced that Tucson's PRO application, one of only 18 selected for funding out of over 200 submitted, had been chosen for PRO funding in the amount of $7,000,000.

22. On January 24, 2025, Tucson executed the PRICE grant agreement and returned it to HUD.

23. On January 25, 2025, Tucson executed the PRO grant agreement and returned it to HUD.

24. Each of the NOFOs provides that a successful applicant like Tucson will be required to submit an "Action Plan" for the grant-funded program through the Disaster Recovery Grant Reporting ("**DRGR**") system, the electronic system used by HUD to manage the grants. HUD will then review the Action Plan to "ensure that the information is consistent with the application and HUD's approval."

**Post-Award HUD Communications**

25. HUD's Office of Community Planning and Development ("**CPD**") hosted a call with all PRICE grant recipients on March 4, 2025, to go over next steps, including the preparation and filing of a PRICE Action Plan.

26. CPD also hosted a call with all the PRO grant recipients on March 19, 2025, to go over the next steps, including the preparation and filing of a PRO Action Plan.

27. Because the awarded PRICE grant amount was smaller than the amount requested in the applications, Tucson and its partners pared down the scope of the project that had been described in their application and prepared the PRICE Action Plan for submittal to HUD.

28. CPD staff requested and held a virtual meeting with Tucson on April 14, 2025. The primary purpose of the meeting was to inform Tucson that an activity outlined in the grant application needed to be removed in order to comply with Executive Order 14151 (the anti-DEI/DEIA order). Tucson removed that activity from the PRO Action Plan.

29. Tucson expected to be able to submit its PRICE and PRO Action Plans through the DRGR system in March or April so that it could obtain HUD's approval of them by May or June and commence the program activities in July. After the above calls, however, HUD essentially stopped communicating.

30. Ann Chanecka ("**Chanecka**"), the Director of Tucson's Housing and Community Development Department ("**HCD**"), received a letter dated May 28, 2025, from Elizabeth S. Hendrix, CPD's Acting Deputy Assistant Secretary for Grant Programs, stating that "As you are finalizing your [PRO action] plan, please be reminded that it is important to align with executive orders and applicable laws" (together with the provision in the Amendment described in paragraphs 31 to 33 below requiring the grantee to comply with future direction for compliance with Executive Orders, the "**E.O. Condition**").

31. On June 5, Chanecka received an email from Ra'Chel'Ni Mar'Na, Senior CPD Representative, stating:

> Dear City of Tucson,
>
> HUD is providing the attached PRICE amendment letter for your review and signature. This amendment letter will be added to your executed PRICE grant agreement file record with HUD. Please note that the signatory to this amendment letter must match the authorized representative for your PRICE grant.

6

Once you have signed the attached amendment letter, please return it to CPDFieldOps@hud.gov and copy me to complete processing.

If you have any questions or need further information, please contact me.

32. Attached to the email was a document (the "**Amendment**") purporting to amend the PRICE Grant Agreement by adding several new conditions to it that are clearly based on Executive Orders issued by President Trump, none of which are, by their own terms, directly applicable to grantees.

33. The new conditions include prohibitions on the promotion of "gender ideology" (the "**Anti-Transgender Condition**")[1] and elective abortions (the "**Anti-Abortion Condition**")[2]; a broad (not funding specific) certification of compliance with all Federal anti-discrimination laws (the "**Anti-Discrimination Condition**")[3]; an agreement that this certification is material to HUD's payment decisions for purposes of liability under the False Claims Act (the "**FCA Condition**")[4]; an open-ended obligation to comply with any future direction from HUD, the Attorney General, or U.S. Citizenship and Immigration Services related to compliance with the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) ("**PRWORA**"), "Executive Order 14218, or other Executive Orders or immigration laws" (the "**Future Directions**

---

[1] *See* Exec. Order No. 14,168, *Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025), § 3(g) (directing federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology").
[2] *See* Executive Order 14,182, *Enforcing the Hyde Amendment*, 90 Fed. Reg. 8,751 (Jan. 24, 2025), § 1 (It is the policy of the United States, consistent with the Hyde Amendment, to end the forced use of Federal taxpayer dollars to fund or promote elective abortion.").
[3] *See* Executive Order 14,151, *Ending Radical And Wasteful Government DEI Programs And Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) (ordering the termination of "all …'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear" and all "'equity-related' grants"); and Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025), § 3(b)(iv)(B) (directing federal agencies to insert terms in every grant award requiring the recipient to certify that it does not operate any programs promoting diversity, equity, inclusion, and accessibility "that violate any applicable Federal anti-discrimination laws").
[4] Exec. Order No. 14,173, *supra* n. 4, § 3(b)(iv)(A).

7

Condition")[5], and a provision prohibiting a jurisdiction from using funding "in a manner that by design or effect facilities the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" (the "**Sanctuary Condition**")[6] (collectively, together with the E.O. Condition, the "**Conditions**").

34.     None of the Conditions in the PRICE Amendment are referenced in the Grant Agreements or the NOFOs. And although the agreements and NOFOs reference several *specific* Executive Orders, none require compliance with Executive Orders generally; certainly not compliance with Executive Orders not even in existence when the NOFOs were issued in compliance with the authorizing legislation.

35.     On June 17, HCD staff emailed the Senior CPD Representative asking whether they could submit the PRICE Action Plan without signing the Amendment. The Senior CPD Representative responded by email the same day, stating that "CPD leadership is implementing an [sic] second level of action plan reviews that will ensure alignment with all statutes and regs, including Executive Orders. This second level AP review is being conducted by HQ and will apply for all CPD grants, including PRO and PRICE." The email further stated that an "action plan checklist" was being reviewed and would be uploaded to the system "shortly" and that grantees would then be able to submit their action plans, but that CPD could not approve the plans "until further guidance is provided." Another email was sent immediately after that, simply urging Tucson to execute and return the PRICE Amendment "at [its] earliest convenience."

36.     It is apparent that HUD will not allow Tucson to draw on the PRICE grant funding unless it executes the PRICE Amendment and will not approve the PRICE or PRO Action Plans if they are not deemed to be sufficiently "aligned" with the Executive Orders.

---

[5] *See* Executive Order 14,165, *Securing Our Borders*, 90 Fed. Reg. 8,467 (Jan. 20, 2025), § 2(f) (stating that it is the policy of the U.S. to "[cooperate] fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities").

[6] *See* Executive Order 14,218, *Ending Taxpayer Subsidization of Open Borders*, 90 Fed. Reg. 10,581 (Feb. 25, 2025), § 2 (noting that it is a goal of the administration "[t]o prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer funded benefits go to unqualified aliens").

37. A recent housing assessment estimates that over the next decade, Tucson will need over 35,000 new units of housing to meet the need; over 22,000 for low-income households. The PRO Housing grant activities are designed to scale up affordable housing production. Without the grant funding, more families will face housing insecurity and homelessness.

38. And as the Tucson summer temperatures rise, tens of thousands of low- and moderate-income households residing in older, poorly maintained manufactured housing units continue to face numerous significant health and safety risks, a situation that the PRICE grant was awarded to help mitigate.[7]

## CAUSES OF ACTION

### Count 1: Separation of Powers

39. Plaintiff re-alleges and incorporates the above as if set forth fully herein.

40. The U.S. Const. art. I, § 8, cl. 1 (the "**Spending Clause**") grants Congress—not the Executive Branch—the power to impose conditions on federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). Any attempt by executive-branch agencies to impose conditions on grant funding that are not authorized by Congress is a violation of the separation of powers doctrine and therefore ultra vires and void. *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

41. Congress did not, in Title I of the Housing Act, or in the 2023 or 2024 Appropriations Bills, impose any of the Conditions or authorize the President or HUD to do so. HUD's attempt to impose the Conditions on grantees like Tucson therefore invades the legislative sphere. Even worse, some of the conditions are *inconsistent* with existing laws:

---

[7] According to Arizona Luminaria, heat caused or contributed to 114 deaths in Pima County between May 2023 and September 2024. Thirty percent of those deaths were in manufactured housing or RVs, though manufactured housing makes up only ten percent of the housing stock in Pima County. https://azluminaria.org/2025/02/17/suffering-hidden-from-view-mobile-home-and-rv-residents-in-pima-county-die-from-heat-at-high-rates/ (visited June 26, 2025).

9

42. *Anti-Transgender Condition*: This Condition, which virtually *requires* grantees to discriminate against transgender individuals, at the very least raises substantial questions under the Civil Rights Act, *see Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) (an employer violates the Civil Rights Act by firing an individual for being homosexual or being a transgender person).

43. *Anti-Abortion Condition*: Use of federal funding for abortions has been prohibited by Congress for years as part of its annual appropriations bills, including the 2023 and 2024 Appropriations Bills (see discussion of Hyde Amendment below). Congress clearly has left no room for the President or HUD to seek to impose an even more restrictive condition prohibiting the use of funds to "promote" elective abortions.

44. *Antidiscrimination and FCA Conditions*: The Civil Rights Act of 1964 provides that no one may be excluded from participating in or be denied the benefits of any federally assisted program based on race, color, or national origin. 42 U.S.C. § 2000d. It authorizes each federal agency to promulgate regulations to effectuate that requirement. 42 U.S.C. § 2000d-1. But the agency must first try to resolve any noncompliance through voluntary/informal means, and it cannot terminate funding unless it satisfies certain procedural requirements. *Id*.

   a) Even more importantly, any funding termination must be "limited to the particular political entity, *or part thereof*, … as to whom such a finding [of noncompliance] has been made and *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found*." *Id*. (emphasis added). The Civil Rights Act also specifically provides that no action against a recipient of federal assistance is authorized based on "any employment practice" of the recipient "except where a primary objective of the Federal financial assistance is to provide employment."

   b) Nondiscrimination specifically with respect to programs under Title I of the Housing Act is addressed in 42 U.S.C. §§ 5309 and 5311 and the supporting regulations are found in 24 CFR Part 1. Remedies for a violation of the nondiscrimination

10

requirements include termination of grant payments "to the recipient under this chapter." 42 U.S.C. § 5311(a).

c) The Antidiscrimination Condition—"Grantee … certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964"—together with the FCA Condition subjects the grantee to loss of its funding—not to mention treble damages and costs—for *any* discriminatory act or policy even if it is completely unrelated to the funded program, and without going through the enforcement procedures required under the Civil Rights Act and Title I of the Housing Act. This is clearly inconsistent with the existing Congressional scheme.

45. *Sanctuary Condition*: Similarly, the Sanctuary Provision goes further than Congress has chosen to go with respect to federally funded benefits and illegal immigration through its enactment of PRWORA. Congress has neither delegated authority to the President or HUD to impose additional restrictions in this area, nor left any room for them to do so.

46. *Future Directions and E.O. Conditions*: Neither the President nor HUD has been delegated authority to impose any of the Conditions, which are based on some of the Trump Executive Orders. That being the case, obviously neither the President nor HUD has authority to go *even further* by requiring compliance with *all* Executive Orders and with future direction from executive branch agencies.

47. Thus, the Conditions, none of which were authorized by Congress, and many of which are inconsistent with existing Congressional enactments, are unconstitutional and void under the Separation of Powers Doctrine.

**Count 2: Spending Clause**

**(Retroactivity)**

48. Plaintiff re-alleges and incorporates the above as if set forth fully herein.

49. Even if we assume for purposes of argument, or the Court ultimately concludes, that HUD *was* authorized by Congress to impose the Conditions on the PRICE

11

and PRO grant programs, those Conditions are still unconstitutional because Congress itself cannot impose conditions on federal funding *after* that funding has been awarded and accepted. Instead, any conditions must be clearly and unambiguously set forth in advance so that the grantee jurisdiction knows before acceptance of the funds what it is agreeing to. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously . . . The legitimacy of Congress's power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts [Congress' conditions] … There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it."); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

50. Therefore, even if Congress *had* attempted to impose the Conditions after Tucson's acceptance of the PRICE and PRO awards, or had delegated to the President or to HUD the authority to impose them after that point, those retroactively applied conditions exceed Congress's authority under the Spending Clause and are therefore ultra vires, unconstitutional, and void.

**Count 3: Spending Clause**

**(Ambiguity and Vagueness)**

51. Plaintiff re-alleges and incorporates the above as if set forth fully herein.

52. As noted above, grant conditions, to be a proper exercise of Congressional authority under the Spending Clause, must be clear and unambiguous. The Anti-Transgender Condition, Anti-Abortion Condition, Antidiscrimination Condition, Future Directions Condition, Sanctuary Condition, and EO Condition, in addition to being untimely, also violate the Spending Clause because they are vague and ambiguous.[8] No person of reasonable intelligence could understand what is required by any of these conditions.

---

[8] Plaintiff is not challenging as ambiguous the FCA Condition or the statements in the Amendment simply requiring the grantee to comply with existing obligations under PRWORA.

12

53. *Anti-Transgender Condition*: This condition prohibits the "promotion" of "gender ideology" as defined in E.O. 14168. That order doesn't, however, give a definition that is capable of consistent application. Rather, it states that:

> ''Gender ideology'' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

This is a political statement full of value judgments, not based in law or fact. It is not a definition that can be applied in any predictable or meaningful way to the determination of legal rights.

54. *Anti-Abortion Condition*: There is also no way to know what might be deemed by HUD to "promote" elective abortions. This requirement is obviously based on E.O. 14182, which states that "[i]t is the policy of the United States, consistent with the Hyde Amendment, to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." The "Hyde Amendment" is a provision that has historically been applied to annual appropriations bills and prohibits the use of appropriated funds to pay for abortions, with certain exceptions. See, *e.g.*, the 2024 Appropriations Act, § 202. While the Hyde Amendment prohibition on directly paying for abortions is clear, the concept of "promoting" them is not at all.

55. *Antidiscrimination Condition*: Though arguably not ambiguous on its face, statements from the Trump administration have created uncertainty about exactly how the administration interprets and intends to enforce the Antidiscrimination Condition. This leaves Tucson in the dark regarding the nature and scope of the obligations they would be undertaking in agreeing to this Condition. See *School Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 277 (6th Cir. 2009) (requirements of grant were ambiguous

in violation of the Spending Clause where its requirements were subject to multiple, plausible interpretations).

56. *Future Directions Condition*: Because this condition requires compliance with requirements that might be promulgated in the future by HUD, the AG, or ICE, regarding compliance with PRWORA or "other executive orders or immigration laws," it is necessarily vague and ambiguous. No one can anticipate what such future requirements might be and therefore cannot knowingly agree to them.

57. *Sanctuary Condition*: This condition prohibits the use of funding "in a manner that by design or effect facilities the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." Many of the words used increase (in combination, exponentially) the lack of certainty, including "by design or effect," "facilities," "subsidization or promotion," "abets," "seek to shield." Reasonable minds would undoubtedly disagree on what those phrases mean, and the federal agencies might well revise their interpretations over time. It is impossible for any jurisdiction to understand what it is agreeing to by accepting such a condition.

58. *E.O. Condition*: As for the catch-all E.O. Condition, it is impossible to know what it means for the Action Plans to be sufficiently "aligned" with current Executive Orders, or what might be required to "comply" with future executive orders.[9] President Trump has passed dozens of orders. As an example, several orders attack "environmental justice" programs.[10] But "resiliency activities"—defined by the PRICE authorizing legislation to mean "the reconstruction, repair, or replacement of manufactured housing and manufactured housing communities to protect the health and safety of manufactured housing

---

[9] In this regard, it should be noted that executive orders can only impose requirements on executive agencies, officers, and employees—not private parties or state and local governments. Regulation of the public, as opposed to internal administration of the government organization, is strictly the province of Congress. *See United States Department of Justice, Executive Orders*, https://bja.ojp.gov/program/it/privacy-civil-liberties/authorities/executive-orders (last visited June 20, 2025) (executive orders are "official documents . . . through which the President of the United States manages the operations of the Federal Government.").

[10] *See, e.g.*, E.O. 14151, *supra* n. 4, § 2(b)(i) and 2(b)(ii)(C); E.O. 14,173, *supra* n. 4, § 2(3)(i) (terminating E.O. 12,898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7,629 (Feb. 11, 1994)).

residents and to address weatherization and energy efficiency"—is a category of activity eligible for PRICE funding, and a significant element of Tucson's program. Is this "environmental justice?"

**Count 4: Spending Clause**

**(Not Related to Purpose of Grants)**

59.  Several of the Conditions are also unconstitutional under the Spending Clause because they are completely unrelated to the purpose of the Congressionally created PRICE and PRO grant programs. *See New York v. U.S.*, 505 U.S. 144, 172 (1992) ("both the conditions and the payments embody Congress' efforts to address [a] pressing problem"); *see also South Dakota v. Dole*, 483 U.S. 203, 209 (1987) (grant conditions must be "reasonably calculated to address th[e] particular . . . purpose . . . for which the funds are expended."). This requirement is crucial: Without "some relationship" between spending conditions and "the purpose of the federal spending," "the spending power could render academic the Constitution's other grants and limits of federal authority." *New York*, 505 U.S. at 167.

60.  There is no such relationship here. The purpose of the PRICE grant program, as stated in the 2023 and 2024 Appropriations Acts, is to provide "competitive grants to preserve and revitalize manufactured housing and eligible manufactured housing communities (including pre-1976 mobile homes) under title I of the Housing and Community Development Act of 1974, as amended (42 U.S.C. 5301 et seq.)." The purpose of the PRO grant program is to provide grants for "additional activities under title I of the Act for the identification and removal of barriers to affordable housing production and preservation."

61.  The purpose of the Conditions, in contrast, is not to further the Congress' intent to increase the safety and affordability of housing for vulnerable populations. Instead, they are being imposed so that federal funding—and the threat of losing it and being subject to treble damages under the False Claims Act—can be used to force local jurisdictions to conform to the Trump Administration's cultural agenda. HUD is essentially holding the

vulnerable population that the PRICE and PRO grants are supposed to be *helping*—low income individuals, particularly those whose health and even lives are at risk because they live in manufactured housing units that cannot protect them from extreme temperatures and other threats to their safety—hostage in order to force local jurisdictions to give up their autonomy and fall in line with the Trump Administrations priorities (Tenth and First Amendments be damned).

62. Use of federal funding for that purpose is exactly what the Spending Clause requirements are designed to prevent.

## PRAYER FOR RELIEF

63. Tucson requests that the Court issue an order providing the following relief:

 a. Pursuant to 28 U.S.C. § 2201, declaring that HUD's attempted amendment of the PRICE grant agreement is unlawful, void, and unenforceable.

 b. Enjoining HUD from conditioning approval of Tucson's PRICE and PRO Action Plans on compliance with the Conditions or any Executive Orders or conditions not referenced in the PRICE and PRO NOFOs or Grant Agreements.

 c. Ordering HUD to (1) allow Tucson to submit its PRICE and PRO Action Plans, (2) review and approve those Action Plans after submittal in a timely manner in compliance with the NOFOs and Grant Agreements, and (3) thereafter administer the PRICE and PRO programs with respect to Tucson without regard to any enjoined conditions.

DATED: July 24, 2025

                MICHAEL G. RANKIN
                City Attorney

                By    /s/ Regina L. Nassen
                      Regina L. Nassen
                      Michelle R. Saavedra
                      Principal Assistant City Attorneys